Good morning. May it please the court, my name is Parlette Michelle Jura. I'm here today as pro bono counsel on behalf of plaintiff appellant Mr. Gregory Lynn Norwood. And with the panel's permission, I'd like to request five minutes for rebuttal. Reserve five minutes of my time for rebuttal. Thank you. This case is about two fundamental constitutional rights. Mr. Norwood's Eighth Amendment right to be free from cruel and unusual punishment and his First Amendment right to petition for redress of grievances. All that Mr. Norwood wants and all that he's asking this court to afford is an opportunity for the district court to have those claims meaningfully considered. And that is something that I think the record here makes quite clear simply did not happen when the district court granted summary judgment in favor of defendants on Mr. Norwood's Eighth Amendment claim and dismissed his First Amendment claim. If we turn to his Eighth Amendment claim first, there is not really any room to dispute that he satisfied the objective prong of the Eighth Amendment analysis. The defendants do not challenge that Mr. Norwood was locked up 24 hours a day, seven days a week for 40 days straight, other than being permitted once every 72 hours to take a shower and restraints after being strip searched. Mr. Norwood also notified defendants that this was causing him physical and psychological harm, and it was also causing a dozen other inmates to suffer physical and psychological harm, and defendants did nothing. Under May, Allen, and Lopez and numerous other cases, that's clear violation under the objective prong of the Eighth Amendment. The district court did not dispute that Mr. Norwood could satisfy the objective prong. What it took issue with and what I think this case comes down to is whether defendants had deliberate indifference. Knowing that Mr. Norwood was suffering physical and psychological harm as a result of the long-term deprivation, did they act with deliberate indifference in failing to do anything, in failing to take any measures to afford him exercise or lift any of the regulations that were called? One thing that's a little odd about the analysis, about the structure of this question as we're supposed to look at it is, if you look at the Thomas opinion, for example, it seems to talk about a reasonableness substantive standard that fits in some place, but it's not really clear to me where. There's a subjective farmer analysis with regard to deliberate indifference, and there's also some, there has to be, and Thomas suggests there is, a substantive standard such that even if they were, if, for example, they knew he was in terrible shape because of this, but still the question is, were they doing it for a good reason, or a reason? Sure. Right. You're absolutely right. But where does that fit? Absolutely. The reasonableness question fits under the second prong of the Eighth Amendment analysis, the subjective component, which asks, were defendants aware of the serious risk, and if they were, did they act reasonably despite their awareness of that risk, to paraphrase. Here, Mr. Norwood pointed to multiple examples of why there's a very serious material factual dispute about whether defendants acted reasonably or not, and the district court nevertheless decided that there was no evidence in the record to call into question the reasonableness of the defendants. Here there's some evidence where he says they were just trying to, somebody said it was all for punishment. So that seems to be some evidence. But suppose there weren't that. Would we still do some kind of reasonableness review, saying, well, this just doesn't, it was months after the emergency, and so on, and so therefore they must have been deliberately indifferent, or what? Yes, Your Honor. I do think that you would look at the reasonableness prong any time you looked at the deliberate indifference question. I think it's one component of a two-part test under the deliberate indifference analysis. And you would look in this case, because we're at the summary judgment stage, to see not whether or not defendants were reasonable after weighing all of the evidence, but whether there's any evidence creating a material factual dispute as to whether they were reasonable. And here I'm more than happy to set aside the evidence just to answer your question about the punitive motive and to talk about the numerous other pieces of evidence that Mr. Norwood put into the record to call into question the reasonableness and show that there's a material factual dispute. For example, the incident itself was one incident that occurred, a series of attacks in one cell block that occurred on August 18, carried out by Hispanic inmates. It was contained the same day. All of the inmates who carried out the attacks were identified and isolated that day from the rest of the prison population. And the next day, Warden Rubino comes in, puts the entire prison on lockdown, declares a state of emergency, and proceeds to search all of the cells and areas accessible to the inmates, starts interviews, retrains the staff in emergency procedures, and eventually, in mid-September, decides that it's no longer necessary to have the prison in a state of emergency, makes the recommendation to the CDCR to lift the state of emergency, which they do, and shifts to a modified program. Now, that all happened two months before Mr. Norwood even arrived at Calpatria. So we already know Mr. Norwood was not involved in the incident and that they contained any emergency that arose because of the incident two months before he showed up. But when he gets there, they nevertheless lock him up, keep him locked up. Two weeks into it, he files a grievance on behalf of himself and a dozen other defendants, explaining that this is causing them harm and violating their Eighth Amendment rights, and the defendants still do nothing. I don't understand. Part of the record is that he was sent to this particular prison because he had demonstrated good behavior, and then he was immediately locked down. I mean, is this a prison where people go, generally, if they've had good behavior otherwise? I don't understand that part of the factual scenario. That's a fair question. I thought there was a general lockdown. I mean, he wasn't singled out for a lockdown. He was not singled out. I'll answer both of your questions. To answer your question, Judge Reinhart, real quickly, he was not singled out. The whole prison was put on lockdown, and actually all general population inmates were deprived of exercise for eight full months after the time that the emergency ended. But that links into my question. If you're rewarding someone for good behavior, why are you sending him to a prison where everybody's on lockdown? Right. And based on the record, what happened is that my interpretation of the evidence here is that the prior prison that Mr. Norwood was at was overcrowded, and they were looking to prisoners who had a good safety record and had been on good behavior, asking them if they wanted to transfer to Calpatria. Initially, Mr. Norwood did not volunteer to transfer when they were asking around, but the prison officials at his former prison approached him and asked him if he would be interested. They ran all of the checks to make sure he had no violent incidents and had been on good behavior, and then they put him on a bus and sent him to Calpatria, where he's basically shipped into a prison that's on a total lockdown as far as exercise is concerned. Additionally, the record, if you read deep into his affidavit, he explains they also took many of the items that he brought with him that he'd been previously allowed to have at the prison, and numerous other things that were quite unfair happened. But what was really harmful to him and what really bothered him was being thrown into a cell for 40 days straight without getting any exercise right after he thought he was coming here because he'd been on good behavior. Does that answer your question? So to go back to the other evidence in the record besides the evidence that defendants were carrying out this lockdown or the deprivation of exercise for such a lengthy period of time in order to punish the inmates and teach them a lesson, putting that aside, we have the fact that the emergency ended two months before Mr. Norwood arrived. Nevertheless, the prison officials continued the deprivation of exercise for more than seven months after he arrived. As to all the general population. You wanted to say five minutes. You've got six if you want to spend a minute on the First Amendment. Absolutely, Your Honor. As to Mr. Norwood's First Amendment claim, the district court ultimately dismissed his claim because it was brought against Sergeant Torres, who the marshals never served. Mr. Norwood made five different attempts and requests to have the district court and the marshals help him effect service. He identified Sergeant Torres. He provided his badge number and the schedule he had at Calpatria when Norwood was there with him. The court ordered the counsel for the government to provide the court with the address for Sergeant Torres in late December of 2007. And defense counsel stonewalled basically Mr. Norwood and the court for three full months, not providing the address and suggesting that through Calpatria prison, they would be able to have Mr. Torres accept service and wouldn't have to provide Mr. Torres's address. Then three months later, they report that Torres has changed his mind. He's not going to accept service through Calpatria. They then provide an address for him, which obviously somebody must have been in contact with him at that point. He knows that he was denied service. Yes, you're right, Your Honor. And from the record, it appears that the counsel for defendants was in contact with people at Calpatria who were in contact with Sergeant Torres. By the time they turned over the address and then by the time the marshals went to that address, he no longer lived there. Yeah, but are you aware that he was in July 26, 2006, he was arrested for possession of methamphetamine, drug paraphernalia, and being under the influence of controlled substances and then was placed on administrative leave? Yes. So would he be in prison at that point? I mean, and certainly someone could have found him. Well, it's a very good question. I'm glad that you asked it because it highlights the problem here, which is that Mr. Norwood did not have counsel. He requested counsel and stressed that he needed help in order to deal with his really significant constitutional claims. The court denied his request. The court also specifically ordered that he not be given the last known address for Torres, and he didn't have any access to information about Torres's criminal conviction, what happened with it, where he was. They effectively put Mr. Norwood in the position of being required to rely on the court and the marshals to effect service. And I think that the fact that he has this criminal history suggests that the defense counsel could have learned his location even if he wasn't at the site. What do we do now? What happened? We send it back and tell them to keep trying to serve him and maybe even tell them where to find him? Yeah. And then what's going to happen with this case? Are you going to approve a First Amendment violation against Torres? Well, I think that Mr. Norwood has a very strong merits-based case against Sergeant Torres, and he would at least like the opportunity. What are you going to get out of that case? Well, Mr. Norwood would like to have the false charge that's in his record right now, which is his only serious infraction, wiped from the record because he believes that he was falsely charged. He is also seeking damages against Sergeant Torres, including punitive— Do you think you're going to collect any damages from him? To be honest, because we were never provided with any information to track down Torres, we haven't located him. We don't know whether he's in prison. We did run searches that we could run publicly to see if he was. You might talk to the state when this is over and see whether they'd be willing to remove the disciplinary mark or whatever it is that you say is a serious thing on his record. I mean, I don't know whether they like to litigate for no particular purpose or they want to defend against habeas no matter what, I know. But I would think if the state were at all reasonable, they might not want to have to litigate the whole First Amendment problem. With an infected guard or witness. I think that's right, and we'd be more than willing to speak with them about that, although we wanted to stress that we think in this case it's important to reverse the dismissal and send this case back to the district court so that we can at least try to locate Sergeant Torres and have him served as a first step. And at that point, I'm sure Mr. Norwood would be happy to talk with defense counsel. I don't know if he would be in state prison or federal prison, at least by now, but these are pretty serious charges. They are serious charges, and we were unable to determine whether he was ultimately convicted and if he's in prison now. OK. We'll just ask the state. They surely they know. Maybe they can tell us right now. Maybe not. OK. Thank you. You happen to know where Mr. Norwood is? Your Honor, no, and the state does not represent Mr. Torres, does not represent Mr. Torres. Right. Yeah. Arguments about him. Right. Well, I'm questioning your statement that you don't represent him, but nonetheless devote several pages of your brief to defending him. Well, the state does not represent Torres but believes the decision as to the rule 4M dismissal was proper and just urges to that affirmance. But just not to lose sight of the context, opposing counsel is basically asking the court to remand this case so it can be dismissed at the district court on a Hickory-Humphrey bar and then relitigated as a habeas claim. And he is free today to file for habeas. I'm sorry. Why is it a Hickory-Humphrey bar? I'm sorry. Mr. Norwood, the charge they want to have overturned, he received a guilty conviction and was docked 365 days a good time. But not guilty in a criminal sense. Was guilty in a prison. Hickory-Humphrey doesn't apply to that. Hickory-Humphrey does not. That's right, it doesn't. So why do you say it did? Well, based on Hickory-Humphrey, Edward V. Belasek, I believe, does. And then Mr. Norwood, to call his conviction into question, would have to have a... But he doesn't have a conviction. He has a disciplinary charge. Correct, Your Honor. In under Ninth Circuit law, Edward V. Belasek, that is something that needs to be addressed in habeas as opposed to through a section... Even though he's no longer in custody for it? Pardon? Even though he's no longer in custody for it? We're talking about... He's not currently in custody for it, right? He's not currently in Act 6 because of that. No, but it's a 365-day loss of good time credit, so he will stay in prison longer. Right, but this is a First Amendment claim, a retaliation claim, right? And the relief he's looking for is expungement of the guilty finding. He's also looking for damages. Who knows? Maybe Torres has some money stored up. Correct. But before you get to the damages, Your Honor, and this is not anything that's been briefed below and not before this court, so it's really just a Rule 4M dismissal issue, but before you get the damages, when you're calling into question your guilty finding in a prison administrative hearing that results in you spending more time in prison, you need to have that called into question and vacated in habeas before you can come under Section 1983. Well, I suppose you can make that argument later, or you have that argument to make. I don't know how valid it is, and I don't think it's something for us to decide. Right now we have to decide the validity of the dismissal of Torres in the circumstances. And not to spend too much time on Torres because that is not the thrust of the case before the court today, but under a Rule 4M dismissal, if good cause is not established by the plaintiff, then the court has discretion to continue to allow him to serve the defendant. In this case, from the end of July 2007 through, I believe, October 2008, or it might be juxtaposing years from 2008 to 2009 in a 15-month period, Mr. Norwood made no future attempt to serve Mr. Torres. And just to clarify the record, on December 27, 2000— Your client is the warden of the prison. Who is your client? Who are you representing? Yes, I represent Warden Gervino and Borland, Janda, and Director Dovey. And are they still at Calipatria Prison? None of them are, unless Borland perhaps still is. Some of them are retired. Dovey is in Sacramento. Okay. And does anybody at the prison know where Torres is? Have you asked? I have not asked, Your Honor. Why not? Pardon? Why not? I mean, we all know he was arrested. We don't know whether he was convicted. Why haven't you asked where he is? Why I would not ask? Yeah. First off, I don't represent Torres, and I'm only—with respect to what happened with the Torres address, my understanding of the record is on December 27, 2006, the court ordered the Deputy Attorney General to turn the address over. She timely opposed that order, stating that it was more appropriate for the inmate to proffer a subpoena, because she didn't represent Torres. The pro se inmate— Pardon? Right, which in my experience is provided to him by the district court, and commonly he would just send it to Calipatria State Prison, and they would be under obligation to turn the address over to him, or find a mechanism—usually the court finds a mechanism not to turn the address over to the inmate. Just to clarify the record, and then she informed the court right after. The court two weeks later said, no, no, you need to turn the address over. She said, well, I've contacted the prison. The litigation coordinator at the prison has told me that she's talked to Torres, and he will take service. She immediately informed the marshal service and the court, and the U.S. Marshals did not go out for the next six weeks. Apparently at the end of the six-week period, Mr. Torres called the prison up and said, no, I'm withdrawing my— Now what year was this? Pardon? What year was this? Oh, 06 going into 07. Okay. And the Deputy Attorney General immediately turned over the address to the marshals—I mean to the—I'm sorry. At that point, the Deputy Attorney General immediately turned over the address in March 2007 to the marshals. The marshals went out four times to the house, and they found out—I think it's the lower court docked at 68— that on June 9th, they learned that Torres had moved six months prior, on December 9th, from that location, which is the only address the Deputy Attorney General had. And that was some two weeks before the court ordered her to turn it over. So I don't see how you get from ordering an attorney who doesn't represent somebody stonewalling when she provides the information, and the U.S. Marshals Service unfortunately does not— But the prison obviously was in contact with the man. Apparently the litigation coordinator at the prison had arranged for the marshals—for her to receive service. Somebody talked to him on the telephone. Somebody spoke to him on the telephone. Correct. So it wouldn't have been too hard to find out where he was. The address that the Deputy Attorney General had, she turned over to the Marshals Service as soon as Torres withdrew his— All right. You're going to discuss the merits of the arrest? Yes, I may. The court should affirm summary judgment for at least two reasons. First, Norwood's 38-day denial of outdoor exercise was the product of reasonable steps to restore prison safety. And second, with respect to the damage claims, defendants are entitled to qualified immunity. Because the law was not clearly established in 2005, precisely how and when a prison needed to resume outdoor exercise during and after a state of emergency called in response to a— Did the district court reach the well-established prong of the qualified immunity analysis? No, Your Honor, and I would urge— Is that before us? I believe it can be and should be. I think this case is unlike Thomas in that defendants have properly pled qualified immunity both at the district court in their answering brief— But what about Runnels? Isn't it just like—I mean, Richardson. Isn't it just like that? It is not like Runnels because here the record is sufficiently developed. In Runnels, the court found that with respect to whether or not to justify a race-based lockdown purely on those grounds, whether it was nearly tailored, the record was not developed, whether or not a reasonable person could find in that case. But here, even though it doesn't have a trial-like record like— But that's not what it said. The defendant says because the district judge didn't decide it. Well, I actually—No, Your Honor, I believe it actually says that the facts haven't been sufficiently developed. Go ahead. So we would urge the court to reach a qualified immunity prong defense here. But before we get there, Norwood can't meet the subjectively serious prong of the deliberate indifference standard because the prison took reasonable steps that had legitimate penological reasons. I know you're arguing that, but isn't that a question of facts for a jury? I mean, it seems to me that in reading this district court opinion, he's making all sorts of findings of fact when there seems to be issues of fact that need to be determined, and you can't grant summary judgment in that basis. Well, I think, Your Honor, I think looking at the Thomas v. Ponder standard, unless there's no—I mean, if their steps are reasonable, then that could excuse the prison officials from liability. Isn't reasonableness a quintessential factual question? I think it's undisputed that there are a number of reasons that Norwood did not dispute with respect to the case at hand here. First off, with respect to the investigations, though the search part of the investigations concluded in September 2005, interviews that commenced immediately after the riot to identify the rioters yielded more leads about future planned assaults. All right, let's go back to Richardson v. Funnels. This is one thing that's—it's really hard to have an argument when you say something and then you tell me what I said isn't true. All right. What the opinion says is here, we do not reach qualified immunity because the issue is—and this is with regard to the parole and unusual punishment part, not the race part—because the issue has never been addressed by the district court, Schneider v. County of San Diego, declining to reach qualified immunity. So it's—I've just spent 2 minutes or 3 minutes not listening to you trying to find out why I thought something that apparently is wrong, and it's not wrong, it's right. So, therefore, doesn't—isn't Richardson authority for not reaching it here? No, Your Honor. I'm looking at page 672 at— So am I. —Richardson. And the last pair—the last sentence in the paragraph, but the facts justifying the exercise of discretion remain to be established at trial. Okay, but that wasn't the reason given for not reaching qualified immunity. Here, we do not reach qualified immunity because the issue has never been addressed by the district court. But I think this case is distinguishable because the record—what the court is referring to is the record is not developed enough— It doesn't say anything about a record. It says the issue has never been addressed by the district court. But it is possible for this court to look at qualified immunity, even though it hasn't been reached by the district court. Well, in a sense, by deciding there was no Eighth Amendment violation, it did address the first prong of qualified immunity, because that would be whether there was a violation of a constitutional right. And then the second prong is the well-established, and that's what the district court didn't do. Correct, Your Honor. Well, in every case, when you find that— All right, go ahead. The prison officials had multiple legitimate security concerns that justified the continuation of the lockdown in November and December 2005. Chief among those was the violence not just in the week before the riot, the riot itself, but the level of violence in the four months after the riot. Now, in an April 2011 request for judicial— At any time, in the past, future, or any other time. Well, excluding the request for judicial notice by Mr. Norwood, the evidence in the record is for the time in the week before the incident on August 18th, there were 11 violent incidents that occurred. And that, on the basis of the expert witness that defendants proffered, was a high level of violence ramping up into the riot. He didn't compare it to anything else either. Pardon? He didn't compare it to anything else. In other words, if this record would substantiate a lockdown, if you could demonstrate— If you can't demonstrate that this was an unusual level of violence, and Thomas basically says this, then you could justify locking everybody down always. No, you can't, Your Honor, because what the prison officials need to do is demonstrate that they're looking at the situation on a daily basis, receiving intelligence from investigations, and taking gradual, measured steps to resume normal operations step by step during a state of emergency or a lockdown. Not during. The state of emergency was lifted. I think it's important not to get caught up in whether it's a state of emergency or a modified programming. It was a lockdown, and it becomes semantics after a while whether what qualifies for a state of emergency versus a modified programming. Suffice to say that this prison was on drastically curtailed operations, and there was a measure that was changed a month after the riot, and there were gradual changes up to and through, including the time that Mr. Norwood was at the prison, and that included restoring outdoor exercise for long-term care inmates. That included restoring visitation privileges for the facility that Mr. Norwood was in, I believe, in October. It involved restoring showers for Mr. Norwood on an unrestrained basis on December 1st. So the prison officials were taking reasonable, measured steps based on the belief they had about the level of violence. Judge Wardle, isn't reasonable a question of fact? Well, I think the facts are undisputed. No, whether it was reasonable, whether their steps were reasonable. Well, as a matter of law, based on what was established or found to be undisputed by the district court, those facts are undisputed as to establishing that these measures that we're talking about were legitimate, reasonable, penological reasons. And at summary judgment, that's an appropriate determination to make, and this court has made that determination in the past and can and should on the facts before us today. The facts in the record are that there was a level of violence occurring at that prison at 15 violent incidents a month in the four months after the riot, and that involved a prison on total 24-7 lockdown. And looking at Noble v. Adams, when that court looked at whether or not specific disruptive events needed to be shown by the prison officials to justify the continuation of the lockdown, I see that my time has expired. The prison officials didn't need to point to specific disruptive events to show continuation of the lockdown. In fact, a lower level of violence, if that's what the court were to find was occurring, was a good sign that the measures were working and that they were therefore reasonable. So that whether there's a lowered measure or a higher measure, it's always reasonable. It's only reasonable, Your Honor, if the prison officials are taking daily measured steps to restore normal operations to that prison. And that's what the record shows here. Seven months they were taking daily steps? Warden Gervino, in his declaration, talks about he conducted daily meetings with his management staff to review the intelligence from the investigations and reviewing the incident reports that were coming in on the level of violence that was occurring. Why isn't it sufficient for the need for the fact that there's conflicting facts that Mr. Norwood has put in declarations that at least two staff people told him that this was really being done sort of demonstratively or for deterrence purposes and not because of essentially to stop people from ever doing this again? That's punishment, to be specific. All right. I would address that in two respects, Your Honor. First, the district court did not admit that statement. And the indication of that is the district court found no evidence of a punitive intent. That's one possibility. The other possibility is she wasn't reading the record. She didn't say, I'm going to admit it. That's a really, really difficult argument. She did not say she wasn't admitting it, right? She didn't specifically refer to that particular statement. What the district court said specifically was she found no evidence of punitive intent. And you've never seen a district judge who just didn't know what was in the record? I've seen both. Having worked for the district court and working for the court. I've never seen an inference that she denied the introduction of evidence from her saying there wasn't any evidence when she didn't deny the introduction of the evidence. All right. What's the next point? Okay. The other point is even if he made the statement, these statements were admitted, there's no nexus, pled, that had anything to do with Warden Gervino or the other named defendants. There's no information in the statement other than a staff told me this, that that person had any authority at the prison regarding participation in deciding what to do about the lockdown. And I think for those reasons, that those statements can't be attributed to Warden Gervino or the other prison officials. And even if the court were to find that there was admissible evidence of a punitive intent, I believe the standard from Thomas v. Ponder is no reasonable penological justification. And here we have a myriad of other reasonable penological justifications. All right. Well, thank you. All right. Just to respond very quickly to Defendant's point about Heck v. Humphrey, as Counselor conceded, it's just nothing they briefed, nothing that was argued before. I'm not aware of any reason why Heck v. Humphrey would apply here. And in particular, the suggestion that it would reduce Mr. Norwood's sentence and therefore somehow would be governed by Heck v. Humphrey, it doesn't make any sense because Mr. Norwood is in prison without the possibility of parole for the rest of his life. And so there's no possibility through his challenge under the First Amendment for him to get out of prison sooner or reduce his sentence. What he wants to have is this false charge that's on his record expunged, and he wants to go after Sergeant Torres for damages. And I think that, as we've discussed in this extensively briefed, there is a clear record here showing that Mr. Norwood did everything he could in his power to try to have the marshals effect service on Torres and that reasonable efforts were not made. And it makes great sense to at least send this case back to the district court for the district court to, at a minimum, require the marshals to try to take reasonable efforts, at least get an affidavit from the marshals saying, I've done everything I can. We cannot locate Sergeant Torres. I've talked to the prison officials at Calipatria, and we cannot locate Sergeant Torres. There is no check being sent to him. There are no addresses that we have in file for him. He's not being sued in other cases. I get that one. What about whether there's a factual issue to be resolved on summary judgment? I think that, quite clearly, there was a question of fact as to whether or not defendants acted reasonably despite the long-term deprivation that was causing harm. And that is something that should not have been resolved on summary judgment. But it's certainly not true that you can ever resolve the question of reasonableness on summary judgment. Judge Berzon, I agree with you. And I think that in this case, there are numerous facts in the record that just create a material factual dispute. So Mr. Norwood is not arguing that you could never— Aside from the two punishment statements, what else was there? Okay. In addition to the fact that the emergency ended in September and the prison guards continued this deprivation of outdoor exercise for seven more months, there's also the fact that Mr. Norwood put in several affidavits from other prisoners saying that in the past there had been violent incidents similar to this one or even worse, arguably, and the prison officials had not responded in this way. They would focus on the gang that perpetrated the incident or the cell block and lock down that cell block and maybe deprive them of exercise because they thought it was unsafe to let them have yard access. But here, the entire prison was on lockdown as far as exercise is concerned for eight full months. That, in response to one incident that occurred in August, which was contained the same day, where all of the people who perpetrated the incident were isolated and moved to Ad Seg, it does not appear reasonable, especially when you factor in— and this is something that I think defendants try to leave out of the calculation— when you factor in the fact that the Eighth Amendment means something. Mr. Norwood has a right to have outdoor exercise. It's not okay to simply lock him up for 40 days or the rest of the prison for eight months just because you want to frost windows and move tables and you're transferring some prisoners around and there was an incident at some point in time. And I think that some of the arguments made by defendants simply demonstrate that no weight was afforded to Mr. Norwood's interest in having out-of-cell exercise. And to go back to evidence of material factual disputes, I think we have the fact that defendants came forward with several post hoc justifications. If we look at the PSRs in the record, all that the defendants wrote was August 18th incident, August 18th incident, it goes on and on and on. Now, when Mr. Norwood challenges what happened, the defendants come forward with a long list of reasons that they had to continue depriving everyone of exercise. For example, they point to the fact that Tookie Williams was going to be executed. By operation of California law, Tookie Williams was not at Calipatria. He was at San Quentin because he was on death row. Their suggestion that, I guess, every prison in California has to be on total lockdown in the time leading up to a potential execution and the time after that seems unreasonable to me. And the fact that they're pointing to that in an effort to try to justify what happened when it doesn't seem justified based on the affidavits that Mr. Norwood put in, based on his explanation of the fact that this was an overreaction at best to a situation, just highlights why this should go back to the district court, why the district court should look at the record closely. And I think if this court is asking what can we do here if this is sent back down, I do think this is a case where it would be appropriate to suggest to the district court that it appoint counsel for Mr. Norwood. He did request that pro bono counsel be appointed. This case has demonstrated that it's actually quite complex. There is new case law coming down that defendants have argued is applicable, such as Noble, which we submitted another 28-J letter about yesterday because it was amended, as I'm sure you're all aware. And I think all of these things going on makes the need for counsel much stronger, and it would be of great service to Mr. Norwood if he could have counsel help him. Are you volunteering? I don't have authority as an associate at Gibson Dunn to actually agree to that, but I am more than happy to do everything I can to facilitate in any way and take all of the work that we've done to try to figure out what actually happened here and provide it to Mr. Norwood's counsel at the district court. And I thank you for your time. Thank you. The case just argued will be submitted.
judges: Reinhardt, Wardlaw, Berzon